UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| MENACHEM GUREVITCH, Individually and on Behalf of All Others Similarly Situated, | **Case No.** |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| KEYCORP, CHRISTOPHER M. GORMAN, BETH E. MOONEY, CLARK H. I. KHAYAT, and DONALD R. KIMBLE, | |
| Defendants. | |

Plaintiff Menachem Gurevitch ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding KeyCorp ("Key" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Key securities between

February 27, 2020 and June 9, 2023, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     Key operates as the holding company for KeyBank National Association ("KeyBank"), which provides various retail and commercial banking products and services in the U.S.  One of the Company's principal sources of revenue is net interest income ("NII"), which is calculated as the difference between interest income received on earning assets (such as loans and securities) and loan-related fee income, and interest expense paid on deposits and borrowings.

3.     Key has repeatedly downplayed concerns regarding its liquidity while touting the effectiveness of its long-term liquidity strategy.  For example, the Company has repeatedly assured investors that its strong core deposit base, in conjunction other funds, supports the Company's liquidity risk management strategy, and that the Company's liquid asset portfolio, *inter alia*, exceeds the estimated amount needed to manage through an adverse liquidity event.

4.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Key downplayed concerns with its liquidity while overstating the effectiveness of its long-term liquidity strategy; (ii) Key overstated its projected NII for the second quarter ("Q2") and full year ("FY") of 2023, as well as related positive NII drivers, while downplaying negative NII drivers; (iii) as a result, Key was likely to negatively revise its previously issued NII guidance; (iv) all the foregoing, once revealed, was likely to negatively impact Key's business, financial results, and reputation; and (v)

2

as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

5.      On March 6, 2023, Key filed its presentation slides for the 2023 RBC Capital Markets Financial Institutions Conference (the "RBC Conference Slides") as an exhibit to an SEC filing, wherein the Company disclosed that it had downwardly revised its FY 2023 guidance for NII, stating that it expects FY 2023 NII to rise by 1% to 4% (assuming a cumulative beta in the mid- to high 30s) compared to FY 2022, representing a significant reduction from the Company's prior guidance that FY 2023 NII would rise 6% to 9% compared to FY 2022.  The Company attributed this negatively revised guidance to "Deposit Beta and Funding  Costs", explaining that "[m]arginal funding costs are increasing with rising market interest rates, and are expected to weigh on [NII.]"

6.      On this news, Key's stock price fell $0.60 per share, or 3.31%, to close at $17.55 per share on March 7, 2023.

7.      On March 13, 2023, following the collapse of Silvergate Bank on March 8, 2023, Silicon Valley Bank on March 10, 2023, and Signature Bank on March 12, 2023, investors grew increasingly concerned about Key's own liquidity.  That same day, Odeon Capital Group LLC ("Odeon") downgraded the Company's stock to hold from buy and BofA Global Research ("BofA") cut its price target on the Company's stock to $17 from $20.

8.      On this news, Key's stock price fell $6.59 per share, or 40.69%, to close at $11.38 per share on March 13, 2023.

9.      Then, on June 12, 2023, at the Morgan Stanley US Financials, Payments, & CRE Conference, Key's Chief Financial Officer ("CFO"), Defendant Clark H. I. Khayat ("Khayat"), disclosed that the Company anticipated Q2 2023 NII to be softer than earlier expected, "based on

funding mix and deposit cost pressures."  At the same conference, Key's Chairman and Chief Executive Officer ("CEO"), Defendant Christopher M. Gorman ("Gorman"), disclosed that clients are demanding higher interest rates on their deposits, and that banks of Key's size are likely facing higher capital and liquidity requirements by regulators.

10.    On this news, Key's stock price fell $0.46 per share, or 4.31%, to close at $10.22 per share on June 12, 2023.

11.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

14.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Key is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

15.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

16.    Plaintiff, as set forth in the attached Certification, acquired Key securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

17.    Defendant Key is incorporated under the laws of Ohio with principal executive offices located at 127 Public Square, Cleveland, Ohio 44114-1306.  Key's common shares trade in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "KEY".

18.    Defendant Gorman has served as Key's Chairman and CEO since May 1, 2020, before which he served as the Company's Chief Operating Officer.  Defendant Gorman has also served as Key's President at all relevant times.

19.    Defendant Beth E. Mooney ("Mooney") served as Key's Chairman and CEO from before the start of the Class Period to May 1, 2020.

20.    Defendant Khayat has served as the Company's CFO since March 16, 2023.

21.    Defendant Donald R. Kimble ("Kimble") served as the Company's CFO from before the start of the Class Period to March 16, 2023.

22.    Defendants Gorman, Mooney, Khayat, and Kimble are collectively referred to herein as the "Individual Defendants."

23.    The Individual Defendants possessed the power and authority to control the contents of Key's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Key's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Key, and their

access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

24.     Key and the Individual Defendants are collectively referred to herein as "Defendants".

## SUBSTANTIVE ALLEGATIONS

### Background

25.     Key operates as the holding company for KeyBank, which provides various retail and commercial banking products and services in the U.S.  One of the Company's principal sources of revenue is NII, which is calculated as the difference between interest income received on earning assets (such as loans and securities) and loan-related fee income, and interest expense paid on deposits and borrowings.

26.     Key has repeatedly downplayed concerns regarding its liquidity while touting the effectiveness of its long-term liquidity strategy.  For example, the Company has repeatedly assured investors that its strong core deposit base, in conjunction other funds, supports the Company's liquidity risk management strategy, and that the Company's liquid asset portfolio, *inter alia*, exceeds the estimated amount that needed to manage through an adverse liquidity event.

### Materially False and Misleading Statements Issued During the Class Period

27.     The Class Period begins on February 27, 2020, the day after Key filed an annual report on Form 10-K with the SEC during after-market hours, reporting the Company's financial and operational results for the quarter and year ended December 31, 2019 (the "2019 10-K").  With

respect to Key's current liquidity position and related recent activity, the 2019 10-K stated, in relevant part:

> Over the past 12 months, our liquid asset portfolio, which includes overnight and short-term investments, as well as unencumbered, high quality liquid securities held as protection against a range of potential liquidity stress scenarios, has increased as a result of an increase in unpledged securities, partially offset by lower balances held at the Federal Reserve. The liquid asset portfolio continues to exceed the amount that we estimate would be necessary to manage through an adverse liquidity event by providing sufficient time to develop and execute a longer-term solution.

28.     With respect to Key's long-term liquidity strategy, the 2019 10-K stated, in relevant part:

> Our long-term liquidity strategy is to be predominantly funded by core deposits. However, we may use wholesale funds to sustain an adequate liquid asset portfolio, meet daily cash demands, and allow management flexibility to execute business initiatives. Key's client-based relationship strategy provides for a strong core deposit base that, in conjunction with intermediate and long-term wholesale funds managed to a diversified maturity structure and investor base, supports our liquidity risk management strategy. We use the loan-to-deposit ratio as a metric to monitor these strategies. Our target loan-to-deposit ratio is 90-100% . . . which we calculate as the sum of total loans, loans held for sale, and nonsecuritized discontinued loans divided by deposits.

29.     Appended as exhibits to the 2019 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Mooney and Kimble "certifie[d] that the Company's [2019 10-K] fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the [Exchange Act] and that the information contained in the [2019 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

30.     On February 22, 2021, Key filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2020 (the "2020 10-K").  With respect to Key's current liquidity position and related recent activity, the 2020 10-K stated, in relevant part:

> Over the past 12 months, our liquid asset portfolio, which includes overnight and short-term investments, as well as unencumbered, high quality liquid securities held as protection against a range of potential liquidity stress scenarios, has increased as a result of an increase in balances held at the Federal Reserve, partially offset by a decrease in unpledged securities. The liquid asset portfolio continues to exceed the amount that we estimate would be necessary to manage through an adverse liquidity event by providing sufficient time to develop and execute a longer-term solution.

31.     The 2020 10-K also contained the same statements as referenced in ¶ 28, *supra*, regarding Key's long-term liquidity strategy.

32.     Appended as exhibits to the 2020 10-K were substantively the same SOX certifications as referenced in ¶ 29, *supra*, signed by Defendants Gorman and Kimble.

33.     On February 22, 2022, Key filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2021 (the "2021 10-K").  With respect to Key's current liquidity position and related recent activity, the 2021 10-K stated, in relevant part:

> Over the past 12 months, our liquid asset portfolio, which includes overnight and short-term investments, as well as unencumbered, high quality liquid securities held as protection against a range of potential liquidity stress scenarios, has increased as a result of the elevated level of deposits. The liquid asset portfolio continues to exceed the amount that we estimate would be necessary to manage through an adverse liquidity event by providing sufficient time to develop and execute a longer-term solution.

34.     The 2021 10-K also contained the same statements as referenced in ¶ 28, *supra*, regarding Key's long-term liquidity strategy.

35.     Appended as exhibits to the 2021 10-K were substantively the same SOX certifications as referenced in ¶ 29, *supra*, signed by Defendants Gorman and Kimble.

36.     On January 19, 2023, Key issued investor presentation slides discussing the Company's fourth quarter and FY 2022 results (the "4Q/FY 2022 Investor Slides").  On a slide titled "2023 Outlook", Key projected that FY 2023 NII would be "up 6% - 9%" versus FY 2022.

37.     On a 4Q/FY 2022 Investor Slide titled "[NII] Opportunities", Key represented that positive "Future [NII] Drivers" included "Organic Growth" from the Company's "[f]ocus on relationship banking [which was] expected to drive continued loan growth and relatively stable deposits"; the Company's "ALM [asset and liability] Management" that was "[p]ositioned to grow [NII] over the next two years, as swaps and short-term Treasuries mature"; and the Company's "Investment Portfolio" that was "[p]ositioned to provide liquidity and enhance returns while benefiting from higher reinvestment rates[.]"

38.     The same 4Q/FY 2022 Investor Slide also downplayed negative future NII drivers, stating that "[m]arginal funding costs are increasing with rising market interest rates, and are expected to weigh on [NII]"; and that "[d]eposit costs are expected to increase as we remain competitive with the industry[.]"

39.     Also on January 19, 2023, Key hosted a conference call with investors and analysts to discuss the Company's fourth quarter and FY 2022 results.  On that call, Defendant Kimble reiterated that NII was expected to be up 6% to 9% versus FY 2022, and provided his rationale for that guidance, stating, in relevant part:

> [NII relative to Key's FY 2022 results] is expected to be up between 6% and 9% reflecting growth in average loan balances and higher interest rates. Our guidance is based on the forward curve, assuming a Fed funds rate peaking at 5% in the first quarter and starting to decline in the fourth quarter. These interest rate assumptions, along with our expectations for customer behavior and the competitive pricing environment are very fluid and will continue to impact our outlook prospectively.

40.     On February 22, 2023, Key filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2022 (the "2022 10-K").  With respect to Key's current liquidity position and related recent activity, the 2022 10-K stated, in relevant part:

Over the past 12 months, our liquid asset portfolio, which includes overnight and short-term investments, as well as unencumbered, high quality liquid securities held as protection against a range of potential liquidity stress scenarios, has decreased primarily due to a reduction in Key's cash position and unencumbered securities portfolio. The liquid asset portfolio continues to exceed the amount that we estimate would be necessary to manage through an adverse liquidity event by providing sufficient time to develop and execute a longer-term solution.

41.    The 2022 10-K also contained the same statements as referenced in ¶ 28, *supra*, regarding Key's long-term liquidity strategy.

42.    Appended as exhibits to the 2022 10-K were substantively the same SOX certifications as referenced in ¶ 29, *supra*, signed by Defendants Gorman and Kimble.

43.    The statements referenced in ¶¶ 27-42 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Key downplayed concerns with its liquidity while overstating the effectiveness of its long-term liquidity strategy; (ii) Key overstated its projected NII for FY 2023, as well as related positive NII drivers, while downplaying negative NII drivers; (iii) as a result, Key was likely to negatively revise its previously issued NII guidance; (iv) all the foregoing, once revealed, was likely to negatively impact Key's business, financial results, and reputation; and (v) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

**The Truth Begins to Emerge**

44.    On March 6, 2023, after markets closed, Key filed the RBC Conference Slides as an exhibit to a current report on Form 8-K with the SEC.  On a slide titled "2023 Outlook", Key provided "[u]pdated [NII] guidance: up 1% - 4% (assum[ing] a cumulative beta in the mid- to high 30s)" (footnote omitted) versus FY 2022, representing a significant reduction from the Company's

prior guidance that NII would rise 6% to 9% in FY 2023 compared to FY 2022. The Company attributed this negatively revised guidance to "Deposit Beta and Funding Costs", explaining that "[m]arginal funding costs are increasing with rising market interest rates, and are expected to weigh on [NII.]"

45.     On this news, Key's stock price fell $0.60 per share, or 3.31%, to close at $17.55 per share on March 7, 2023. Despite this decline in the Company's stock price, Key securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions regarding the Company's liquidity and projected NII.

46.     For example, on an RBC Conference Slide titled "[NII] Opportunities"—which immediately followed the "2023 Outlook" slide—Key assured investors that the Company was "[a]ctively managing downside risk while maintaining significant upside potential."

47.     On the same RBC Conference Slide, Key represented that the Company's positive "Future [NII] Drivers" included "Organic Growth" from the Company's "[f]ocus on relationship banking" that was "driving loans and deposits"; the Company's "Investment Portfolio" that was "[p]ositioned to provide liquidity and enhance returns while benefiting from higher reinvestment rates"; and the Company's "Balance Sheet Positioning" with the "[o]pportunity to accelerate realization of value of short-term Treasuries" and which involved "[e]xecuting hedges to manage downside risk[.]"

48.     The statements referenced in ¶¶ 46-47 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Key overstated its positive NII

drivers; (ii) the foregoing, once revealed, was likely to negatively impact Key's business, financial results, and reputation; and (iii) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

49.     On March 13, 2023, following the collapse of Silvergate Bank on March 8, 2023, Silicon Valley Bank on March 10, 2023, and Signature Bank on March 12, 2023, investors grew increasingly concerned about Key's own liquidity.  That same day, Odeon downgraded the Company's stock to hold from buy and BofA cut its price target on the Company's stock to $17 from $20.

50.     On this news, Key's stock price fell $6.59 per share, or 40.69%, to close at $11.38 per share on March 13, 2023.  Despite this decline in the Company's stock price, Key securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions regarding the Company's liquidity and projected NII.

51.     For example, on April 20, 2023, Key issued a press release announcing the Company's first quarter 20223 results (the "1Q23 Press Release").  That press release asserted that Key's "[d]urable, relationship-based business model provides stability and positions the [C]ompany to perform well throughout the business cycle"; and that the Company had "[s]trong liquidity and funding, supported by diverse, core deposits[.]"

52.     With respect to Key's NII results for the quarter, the 1Q23 Press Release stated, in relevant part:

> Taxable-equivalent [NII] was $1.1 billion for the first quarter of 2023 and the net interest margin was 2.47%. Compared to the first quarter of 2022, [NII] increased $86 million and the net interest margin increased by one basis point. [NII] and the net interest margin benefited from higher earning asset balances and higher interest rates, partly offset by higher interest-bearing deposit costs and a shift in funding mix.

Compared to the fourth quarter of 2022, taxable-equivalent [NII] decreased by $121 million, while the net interest margin decreased by 26 basis points. [NII] and the net interest margin reflect higher interest-bearing deposit costs and a change in funding mix, partly offset by higher earning asset balances and a benefit from higher interest rates. Additionally, [NII] was lower reflecting two fewer days in the first quarter of 2023.

53.     Also on April 20, 2023, Key hosted a conference call with investors and analysts to discuss the Company's first quarter 2023 results.  On that call, in response to an analyst question regarding NII outlook for the year, Defendant Khayat represented that Key's NII was expected to decrease by only 4% to 5% in Q2 2023.  That exchange read, in  relevant part:

**[Analyst]**

Just a couple of questions regarding the NII outlook for the year. Can you just share with us your thought of the noninterest-bearing deposit mix shift? How you view that progressing and then -- and then also on the progression for the second quarter, just regarding Scott's question on the margin, you mentioned that you see a pullback again in the second quarter and then inflection. Can you maybe help us size up that amount of margin compression incrementally in the second quarter? Thanks.

**[Defendant] Khayat**

                                                        * * *

***As it relates to [NII], second quarter, we'd expect that to be down kind of 4% to 5% in Q2*** with NIM, NIM coming down ***in part because we're carrying a little bit excess liquidity*** post the early March period, and we would see that come down we think maybe another 6 to 8 basis points. And then as I responded to and Scott's question, kind of stabilize and start to come back up in the second half of the year.

(Emphases in bold and italics added.)

54.     The statements referenced in ¶¶ 51-53 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Key downplayed concerns

with its liquidity; (ii) Key overstated its projected NII for Q2 2023; (iii) as a result, Key was likely to negatively revise its previously issued NII guidance; (iv) all the foregoing, once revealed, was likely to negatively impact Key's business, financial results, and reputation; and (v) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

### The Truth Fully Emerges

55.     On June 12, 2023, at the Morgan Stanley US Financials, Payments, & CRE Conference, Defendant Khayat disclosed that the Company anticipated Q2 2023 NII to be softer than earlier expected, "based on funding mix and deposit cost pressures."  Specifically, Defendant Khayat warned that NII would probably drop 12% in Q2 2023, compared to the Company's prior projection that NII would only drop 4% to 5%.  At the same conference, Defendant Gorman disclosed that clients are demanding higher interest rates on their deposits, and that banks of Key's size are likely facing higher capital and liquidity requirements by regulators, adding: "We're paying very close attention to our RWAs [risk-weighted assets] because we don't know how this is going to play out[.]"

56.     On this news, Key's stock price fell $0.46 per share, or 4.31%, to close at $10.22 per share on June 12, 2023.

57.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

58.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the Company's securities during the Class Period (the "Class"); and were damaged upon

the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

59. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Key securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Key or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

60. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

61. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

62. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

15

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Key;

- whether the Individual Defendants caused Key to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Key securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

63.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

64.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Key securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

16

- Plaintiff and members of the Class purchased, acquired and/or sold Key securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

65.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

66.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

67.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

68.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

69.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Key securities; and (iii)

cause Plaintiff and other members of the Class to purchase or otherwise acquire Key securities and

options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of

conduct, Defendants, and each of them, took the actions set forth herein.

70.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the

Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly

and annual reports, SEC filings, press releases and other statements and documents described

above, including statements made to securities analysts and the media that were designed to

influence the market for Key securities.  Such reports, filings, releases and statements were

materially false and misleading in that they failed to disclose material adverse information and

misrepresented the truth about Key's finances and business prospects.

71.      By virtue of their positions at Key, Defendants had actual knowledge of the

materially false and misleading statements and material omissions alleged herein and intended

thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants

acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose

such facts as would reveal the materially false and misleading nature of the statements made,

although such facts were readily available to Defendants.  Said acts and omissions of Defendants

were committed willfully or with reckless disregard for the truth.  In addition, each Defendant

knew or recklessly disregarded that material facts were being misrepresented or omitted as

described above.

72.     Information showing that Defendants acted knowingly or with reckless disregard

for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers

and/or directors of Key, the Individual Defendants had knowledge of the details of Key's internal

affairs.

18

73.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Key.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Key's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Key securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Key's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Key securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

74.     During the Class Period, Key securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Key securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Key securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Key securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

75.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

76.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

77.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

78.     During the Class Period, the Individual Defendants participated in the operation and management of Key, and conducted and participated, directly and indirectly, in the conduct of Key's business affairs.  Because of their senior positions, they knew the adverse non-public information about Key's misstatement of income and expenses and false financial statements.

79.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Key's financial condition and results of operations, and to correct promptly any public statements issued by Key which had become materially false or misleading.

80.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Key disseminated in the marketplace during the Class Period concerning

Key's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Key to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Key within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Key securities.

81.     Each of the Individual Defendants, therefore, acted as a controlling person of Key. By reason of their senior management positions and/or being directors of Key, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Key to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Key and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

82.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Key.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

                    Respectfully submitted,

                    DITTMER, WAGONER & STEELE, LLC

                    /s/ *Robert J. Wagoner*_____
                    Robert J. Wagoner (0068991)
                    107 W. Johnstown Road
                    Gahanna, Ohio 43230
                    Telephone: (614) 471-8181
                    Facsimile: (614) 540-7473
                    bob@dwslaw.com

                    POMERANTZ LLP
                    Jeremy A. Lieberman
                    (*pro hac vice* application forthcoming)
                    Gustavo F. Bruckner
                    (*pro hac vice* application forthcoming)
                    J. Alexander Hood II
                    (*pro hac vice* application forthcoming)
                    600 Third Avenue
                    New York, New York 10016
                    Telephone: (212) 661-1100
                    Facsimile: (917) 463-1044
                    jalieberman@pomlaw.com
                    gfbruckner@pomlaw.com
                    ahood@pomlaw.com

                    *Attorneys for Plaintiff*